Good morning. I thought it would be appropriate, since today is a day of remembrance for Americans, that we take a moment to recall the events of 12 years ago. It seems to me that it is proof that in the human heart, there is more room for hate than there is for love. And the emotion of hate is stronger than the emotion of love. And that has been historical, and it has continued, and it continues every day. And until humankind realizes that we are all one, and that any difference because of nationality, ethnicity, race, religion, gender, sexual orientation, economic factors, we're still one. And I think the lesson we need to remember, particularly as lawyers, because it is our job, I believe, to reduce conflict, to seek peace. We are the peace-seekers. You are the peace-seekers, as lawyers. And I think that's what we need to recall for today. I'd like to close by reading a poem that was written by Leslie Coulson, who was a poet who died at age 27 during World War I in battle. The poem is called, Who Made the Law? And I'm only going to read excerpts of it. Who made the law that men should die in meadows? Who spake the word that blood should splash in lanes? Who gave it forth that gardens should be boneyards? Who spread the hills with flesh and blood and brains? Who made the law? Who made the law that death should stalk the village? Who spiked the sheaves? Who gave it forth that death should lurk in hedge burrows? Who flung the dead among the fallen leaves? Who made the law? Those who return shall find that peace endures. Find old things old and know the things they knew. Walk in the garden, slumber by the fireside. Share the peace of dawn and dream amid the dew, those who return. But who made the law? The trees shall whisper to him, see, see the blood, the splashes on our bark? Walking the meadows, he shall hear bones crackle and fleshless mouths shall gibber in silent lanes at dark. Who made the law? Who made the law? At noon upon the hillside, his ears shall hear a moan, his cheeks shall feel a breath, and all along the valleys, past gardens, croft, and homesteads. He who made the law, he who made the law, he who made the law shall walk along with death. Who made the law? I'm going to ask for a moment of silence. Please call the first case. Council, please approach the bench. Please identify yourselves, your parties, and how you're going to split your time. Thank you. Raymond Groble on behalf of BNSF Railway Company. I would like 10 minutes for my primary argument and two minutes in reserve. Good morning, Your Honors. Peter McLeod on behalf of Quality Terminal Services. I would imagine about 10 minutes for my arguments. Good morning, Your Honors. My name is Jack Kennedy. I would also like 15 minutes, please. Okay. That's fine. Judge, I neglected to introduce my partner, Sean Sullivan, who is also representing BNSF Railway Company. Thank you. You may proceed. Good morning. May it please the Court. Council, Raymond Groble on behalf of BNSF Railway Company, and as I said earlier, Sean Sullivan also on behalf of BNSF Railway Company. One of the main issues presented by this case is when is BNSF required to provide notice to QTS of a claim or suit. I suggest to you that the answer to that question is only when BNSF knows that QTS is responsible for that claim or suit. The applicability of the indemnity agreement is not disputed in this case. The only question is whether the notice provided by BNSF was reasonable under the contract. And I suggest it was reasonable when viewed in light of the contract provisions and BNSF's limited knowledge of QTS's responsibility for Mr. I believe you are referring to paragraph 5D of the contract, Your Honor, and I suggest to the Court that that has to be read in context. And it does say, in relevant part, for which, in the context of the contract, for which the claimant is entitled to provide notice to QTS of a claim or suit, and I think that's correct. In the event any claim or suit is brought against the indemnified parties arising out of work performed, materials furnished, or other activities conducted under the terms of the agreement, comma, for which contractor is responsible under the terms of the agreement. And that is a qualifying and limiting phrase to the notice requirement. And I would suggest to the Court that that notification provision applies only when there is a claim for which QTS is responsible under the contract. That's what that says. And the predicate phrase to that says, in the event any claim or suit is brought against the indemnified parties, for which contractor is responsible under this section 5, then it has, or in the event any suit, for which contractor is responsible under the provisions of the agreement. Now I might have written that a little differently, but clearly that's part of the same sentence and that's a correct. And he's a crane operator employed by BNSF. Yes, but as a crane operator he can work either as a crane operator or crane director. So he could be in the crane or on the ground and could be either way. But BNSF has a policy that a crane operator always has to work with crane director on the ground, right? Right. So they know he's working alone. BNSF did not know that he was told by Mr. Stephenson to work alone, that he protested that and that Mr. Stephenson forced him essentially to work alone. Isn't the logical question, when BNSF discovers that he's working alone, to say to somebody, why? Why was he working alone? He's operating the containers on the chassis. Why is he doing all that by himself? Well, I would suggest to the Court that that only becomes clearer later on, because what his personal injury report says was picking up ground and containers off the ground and placing on chassis, while locking container on chassis, left front pin wouldn't go in by hand, use five iron. So putting it on the chassis as a crane operator, locking it or working with the pin as a crane director, and Mr. Williams could have easily been working as a crane director at the time of this accident as a crane operator. But notwithstanding, BNSF talked to his partner, Ms. Damon, who said I was in the So they knew he was working alone. Correct. But they did not know that QTS, him working alone is not by itself sufficient to impose any liability on QTS. It doesn't necessarily arise out of QTS's acts or omissions because Mr. Williams is working alone. It's only the fact that QTS told Mr. Williams to work alone that imposes liability on QTS. In order to evaluate the reasonableness of the notice, we need to examine the contract between QTS and BNSF and the respective obligations. QTS agreed to indemnify BNSF for injury to BNSF's employees arising out of QTS's acts and omissions unless caused by BNSF's sole negligence. BNSF agreed to give QTS reasonable notice of any claim or suit for which QTS is responsible under the agreement. QTS consistently misstates this notice provision in its brief as requiring notice for claims, quote, arising out of the work performed. But as we just discussed, you have to read the entire sentence. The following clause qualifies and limits that by the words for which contractor is responsible under the provisions of this agreement. I know I'm interrupting you, but to me there's a preliminary question that needs to be addressed and that has to do with whether this appeal should be heard by us, a jurisdiction question. Certainly. And looking at the record, it's my understanding that there was no written order by Judge McWilliams when she ruled on all but the one issue which was reserved in April. Is that correct? That's correct, Your Honor. So in no time thereafter was there a written order with regard to the 75 issues that had been brought up post-trial. The only order that I'm aware of was the one in June where there was some dispute as to how the order should read and the judge then was involved and set forth how the order should read. And that particular order only refers to the one issue which had to do with the set-off. Well, I would suggest, Your Honor, it refers to much more than set-off. The whole issue under Roman numeral VI of our post-trial motion was reserved by the judge. And that had to do with Railroad Retirement Board issues requiring a remitter of the lost wages awarded, a remitter for RRB disability payments received, and a set-off for RRB taxes. But when you look at the transcript of the argument on the party's post-trial motions, Judge McWilliams says the only issue I'm reserving is what she refers to as the taxation issue. That is, whether BNSF was entitled to a set-off for future taxes that it would have to pay on lost wages awarded to Mr. Williams. I didn't see her saying, I'm reserving ruling on all issues raised in Roman numeral VI. But, Your Honor, she never did address any of those other issues in her previous rulings. Well, wouldn't you say other issues you're referring to? The remitter for the – But all those have to do – irrespective of issues that had to go to the judgment, those have to do with the amount of the judgment, the remitter issues. The remitter is not an attack on the judgment, was it? Well, the remitter is an attack on the amount of the judgment, certainly, Your Honor. It's not an attack on the judgment, so – On the liability finding? No, Your Honor. It was not. But the argument that we made with respect to the RRB disability payments is that because Mr. Williams was receiving the RRB disability payments, he was not entitled to also claim lost wages. But that's a separate issue. The remitter issue based on Mr. Williams' receipt of disability payments is separate from the issue raised by BNSF about a set-off for taxes it would have to pay in the future, right? They're two different issues. But they were included in a single argument we made and were all part of a unified post-trial motion. But Judge McWilliams, I didn't read the transcript as her acknowledging that she had not resolved the remitter issue. She said she had, and the only thing that she had reserved was the set-off for future taxes. Well, I would suggest that even if that is the case, this is still a timely appeal because we could not have filed a notice of appeal and then had the judge deal with a taxation issue. Why not? Because it was all part of the same case. But that's not the test, is it? Well, right. But the purpose – Of course it's going to be the same case. That's always the issue. Right. That's another issue. Well, Judge, I suggest that this Court previously dealt with this on the motion to dismiss when it denied the motion to dismiss. And I know that doesn't preclude your review of it now. So assume we're reviewing it. I do, Your Honor. My view of it is that all of the RRB issues were still undecided as of the time of the judge's June 2012 ruling. But how many issues did you raise under Roman numeral VI? We raised remitter issues, RRB disability payments, either for wages or for other things set off for RRB taxes. So they are essentially two sides of one issue, and then the third issue regarding taxes. If you say that the disability issue was still pending, how do you explain Judge McWilliams saying, it wasn't pending, but it's appropriate for BNSF to bring new authority to my attention? Well, on June 1st, 2012, she said in the brief that we filed had to do with the remitter issue, she said, I'm going to ask you to come back one last time. I'm going to give you a record you can take up, because I assume you're going to take up this case. So that suggests to me that at that point, June 1st, Judge McWilliams did not consider all the post-trial issues resolved. And I think that's borne out by the form of her order, which says it's final and appealable in a 304 finding, which is not applicable in this case, obviously. But was that, the language seems to me to be only directed to the tax issue, SACS setoff, not to any, it talks about relating specifically to issues other than the 75 other issues that had been resolved back in April. Correct. But on June 6th, she said, the case came before me on a ruling on that portion of the post-trial motion of the defendant seeking a remitter on lost wages, or in the alternative, a remitter setoff for an amount equal to the RRB disability payments. So it is a remitter. It's not just a setoff for the tax payments. We're looking to attack the entire amount of the verdict, his lost wage claim, which is a key part of the damages element. If we had filed a notice of appeal prior to that and sought to set a supersedious bond, while that's pending, we don't know what the amount of that bond should be because we don't know what the amount of the judgment is. You know, the only case that was cited on this is the Star Charters v. Figueroa case. And I think that that came kind of the flip side of this argument, where when the plaintiff filed an appeal from a claim for a setoff for prior judgments or prior settlements, and the court said first that the motion for setoff didn't have to be filed within 30 days. This is not a motion for setoff. This is a motion for a remitter. And it said that the appeal was timely from it. But the issue relating to the future taxes was a motion for setoff, right? It wasn't a remitter. Right. But it's clear that on June 6, the court considered and ruled on the motion for remitter. She says that in the part of the transcript I just quoted. This case came before me for a ruling on that portion of the post-trial motion of the defendant seeking a remitter on lost wages. Or, in the alternative, a remitter or setoff for an amount equal to the RRB disability payments. So there were two items that she considered at that time. And one of those was clearly a remitter directed to the largest portion of the verdict, his claim for future lost wages, when he is receiving RRB disability payments. Anybody have any answers to your questions? Thank you. Thank you very much. All right. You want to close? Huh? Well, you're going to get another two minutes. Oh, I didn't see any time here. No, we don't use that. We don't use it. Okay. So I take it I'm out of time. Well, if you have something else you want to add. Well, Judge, I think I've addressed the main issues. For the rest of the issues, we will rely on our briefs and the request for relief in them. Thank you. Thank you. Thank you. Don't rely on the light. We won't turn on the light. May it please the Court, Counsel, once again, my name is Peter McCloud, and I represent Quality Terminal Services in this case. I would like to address three main points today. First is what notice requirements did the contract impose upon BNSF as a conditioned precedent to seeking indemnification from Quality Terminal Services? Next, BNSF's failure to meet those requirements, and that is its failure to provide reasonable notice to Quality Terminal Services. And lastly, BNSF's failure to present an appealable issue for review here. With respect to the notice required under the contract, BNSF asked the Court to ignore its contractual notice obligation, suggesting that under the contract it was required to give notice only when it had reason to believe that QTS might be responsible for Mr. Williams' injury. BNSF claims this occurred when Mr. Williams testified at his deposition in May of 2007. However, that's not what the contract provides for. Under the contract, BNSF was required to provide notice to QTS in either of two events, and one of those triggering events is when a claim is asserted against BNSF for which QTS is responsible. But notice is also triggered by a second event, a claim being asserted against BNSF that arises out of work performed by QTS. Counsel referenced the last clause of the notice provision and implied that that modified the entirety of it. However, that last clause modifies the second event portion of the notice requirement, and that simply clarifies that a claim must arise under the work performed or activities conducted by QTS. On what basis do you say it modifies that clause rather than the other? Because the notice provision is disjunctive. It says, specifically, the first clause starts with, in the event that any claim or suit is brought against the indemnified parties, which is BNSF, for which the contractor is responsible. And then the disjunctive comes, which is or, in the event any claim or suit is brought against the indemnified parties arising out of work performed, materials furnished, or other activities conducted under the terms of this agreement. Then you get the last clause. It's the disjunctive that creates the two distinct obligations under the contract to provide notice to quality terminal services. Now, BNSF contracted with QTS to provide certain intermodal services at its Cicero facility, including having QTS ramp managers issue job assignments to the BNSF crane operators like Mr. Williams. Thus, under the contract, BNSF was required to provide QTS with reasonable notice in writing of any claim asserted against BNSF arising from Mr. Williams' job assignments, not just those that possibly implicated QTS. And BNSF can't just pick and choose what parts of the contracts it would like to comply with. However, even if the court were to focus solely on the first triggering event, the result would be the same, which brings me to my next point. Under Peddrick, a motion for directive verdict can only be granted in those very limited cases where the evidence, when viewed in the light most favorable to the non-movement, so overwhelmingly favors the movement that no contrary verdict can stand, and BNSF simply can't meet that high standard. And particularly, a directive verdict is inappropriate whereas here there is any evidence, together with the reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute. Here there was significant evidence of such a dispute. Over the course of several days following Mr. Williams' accident on August 21, 2003, BNSF conducted two separate investigations, including an investigation conducted by Kevin Bell, who was their claims representative, claims manager responsible for providing QTS with notice pursuant to the agreement. And thus, within days of the accident, BNSF knew the following. First, that QTS assign the job duties to Mr. Williams the night of his injury. Second, the contract between BNSF and QTS obligated BNSF to provide reasonable written notice to QTS of any claim arising out of the work performed by QTS. Third, that Mr. Williams, whose assigned job was that of a crane operator, was performing the separate job duties of a crane director by locking the front locking pins of the chassis at the time he claims he was injured. Fourth, that Mr. Williams was locking the front pins in violation of company rules. Fifth, that Mr. Williams was improperly using a five iron in a baseball swing manner in violation of company rules. Sixth, that Mr. Williams had been working alone because he had performed the job tasks of both the crane operator and crane director and because Bonnie DeMond had told him she was sitting in the locker room reading a book at the time or having her lunch at the time that the injury occurred. Seventh, that as a railroad worker, Mr. Williams' sole avenue of redress for a workplace injury was via the Federal Employer's Liability Act, which has a very low causation threshold. And eighth, that it had terminated Mr. Williams the same night that he reported a workplace injury. Thus, whether examining BNSF's notice obligation under either triggering event, BNSF possessed knowledge that Mr. Williams was injured while working under the supervision of QTS while he was working the wrong job assignment and violating company rules. Thus, within days of the incident, BNSF knew that Mr. Williams claimed he had sustained a workplace injury while working alone and BNSF was obligated at that point to provide the requisite notice to QTS. Now, if there was any doubt in BNSF's mind at that point, that Mr. Williams was actually going to pursue a claim based on his injury, that doubt was erased when BNSF received a letter from Mr. Williams' attorneys dated December 4, 2003 notifying BNSF that Mr. Williams had retained those lawyers to represent him in connection with the claim, demand, or cause of action against BNSF, growing out of personal injury sustained as a result of negligence in the management and maintenance of the Cicero facility. Even when given this confirmation, BNSF did nothing. Subsequently, BNSF received an additional letter from a separate set of attorneys in March of 2005 notifying them of the claim. And then in August of 2006, they received the lawsuit that Mr. Williams filed. In either case, BNSF did nothing, did not provide notice to Quality Terminal Services. BNSF maintains that it provided notice to QTS after Mr. Williams' deposition in May of 2007 and that's when it suggests that it first learned that Mr. Williams was alleging that it worked alone. Notwithstanding the fact that BNSF knew or should have known within days of Mr. Williams' injury that he was claiming that he was working alone, BNSF again waited more than two months. But what they're saying is that was the first time we learned he had been directed by a QTS supervisor to work alone. Well, I suggest, Your Honor, that the inference that can be drawn from the facts is that he was working under the supervision of a QTS ramp manager at the time, so any job assignment that he had had to have come from QTS. And so I believe the inference that can be drawn from that is BNSF did, in fact, know that he was working alone under the supervision of QTS. But even at the point where they are alleging that they learned of this direct implication of QTS involvement, BNSF again waited more than two months to provide notice to Quality Terminal Services. Thus, this was not a case in which there was just any or some evidence to support the argument that BNSF's notice was not reasonable. To the contrary, the weight of the evidence leads to the opposite conclusion that BNSF's nearly four-year delay in providing notice of Mr. Williams' claim was unreasonable. And given these facts, BNSF cannot meet the high burden of PEDREC. Now, having said all that, the Court need not address those arguments, which brings me to my last point. BNSF has failed to raise an appealable issue here. In its opening brief, BNSF identified the issue presented for review by this Court against QTS as whether the Court erred in denying BNSF's motion for a directed verdict on the indemnity claim where there were no factual disputes and the evidence established as a matter of law that BNSF gave reasonable notice to QTS. Thus, BNSF's appeal as to QTS is based exclusively on BNSF's argument that the trial court erred in denying BNSF's motion for a directed verdict. The fatal problem here is that the trial judge never issued such a ruling. BNSF concedes as it must that it did not make a written motion for a directed verdict, but suggests that it made an oral motion citing to colloquy with the trial judge during the hearing on QTS's motion for directed verdict. However... Well, but in that colloquy, counsel for BNSF does say, and we would cross-move. That is absolutely correct, Your Honor. The point here is that at the end of that hearing, Judge McWilliams says, so your motion is denied, QTS's motion is denied. She says nothing about BNSF's motion. There is no evidence in the record that BNSF ever made an attempt to clarify that ruling, and thus there is no ruling for BNSF to appeal here. Just like its attempt to rewrite the contract, BNSF seeks to redo the sole issue that is presented for review here. And despite the fact... Strike that. The salient point here is that, and I'll cite to the Court to a case, Hadley v. Ryan, 345 Illap 3rd, 297, out of the 4th District, 2003. And there the appellate court noted the longstanding rule that a litigant's failure to obtain a ruling on a motion does not translate into a denial of the motion by the court. Rather, as this Court discussed, in Commerce Trust Company v. Air First Aviation Companies, 366 Illap 3rd, 135, it is the responsibility of the party filing a motion to request the trial judge to rule on it. And when no ruling has been made on a motion, the motion is presumed to have been abandoned. Moreover, as the appellate court held in Jackson v. Alvarez, 358 Illap 3rd, 555, out of the 4th District, 2005, whereas here a party subsequently files a notice of appeal without obtaining a ruling on a motion, the motion is deemed to have been abandoned and a party is precluded from seeking appellate relief. Thus, as the purported movement, it was BNSF's obligation to obtain a ruling from the trial court before filing its notice of appeal. BNSF did not do that, and failing to do so has abandoned any motion for directed verdict that it may have had. Therefore, there is no appealable issue as to the indemnification verdict in favor of QTS. Thank you. Good morning, Your Honors, and may it please the Court. The trial court's evidentiary rulings are reviewed for an abuse of discretion. Under this highly deferential standard, the trial judge's decision will stand unless it was so fanciful or arbitrary that no reasonable judge would agree with it. In this case, the judgment on the jury's verdict should be affirmed because BNSF has failed to show that any abuse of discretion occurred below. Our position in this appeal is twofold. First, it was well within the court's discretion to exclude evidence that BNSF fired Mr. Williams after he was injured because that post-injury termination was irrelevant to the contested issues at trial. Second, even if that evidence held some marginal probative value, excluding it was still within the court's discretion because doing so avoided a mini-trial on a collateral issue. But before I address the termination evidence issue, I'd like to briefly respond to some of the opposing counsel's comments concerning the jurisdictional issue. Counsel stated that BNSF could not have filed a notice of appeal until it got that written order, that subsequent written order relating only to taxes and disability payments. That's simply incorrect. The Illinois Supreme Court rules governing civil appeals allow a party to file a protective notice of appeal. The prudent course of action here would have been for BNSF to file a notice of appeal after Judge McWilliams ruled from the bench that all post-trial motions are denied with the exception of the taxation issue. They could have, but they didn't have to. So I mean, the question is, would they have known what kind of bond to put up, what the amount was when there was an issue as to the amount of the judgment? I mean, that's his argument. I agree that it's a novel situation, Your Honor, but the confusion here was created by BNSF by coupling their post-trial motion with requests that had to do with, you know, setoffs and other matters that simply didn't attack the judgment. We actually pointed that out in our response to BNSF's post-trial motion, that there were these improper collection-type issues included in BNSF's post-trial motion. So we did alert BNSF to this problem. So this is a novel jurisdictional issue. Our submission doesn't take any position one way or the other as to whether this court has jurisdiction. We simply note that there are these two threshold problems that this court must resolve before reaching the merits, which is if an oral denial of post-trial motions is effective, then the appeal should be dismissed for lack of jurisdiction. Well, if it isn't, there was never a ruling on the ---- That's correct, Your Honor. And then there's no jurisdiction here because that order relates only to taxes and disability payments. And those other points of error, I think there were 46 that were raised by BNSF and more by QTS, haven't been ruled on. And so this would have to go back to the circuit court for a written order in the law record denying those motions before this court would have jurisdiction under Rule 303. And we don't need to do that. The rules say that an oral ruling is fine. Well, if an oral ruling is fine, then BNSF's notice of appeal is untimely because on April 18, 2012, Judge McWilliams denied all post-trial relief. She did reserve ruling on this request for a set-off for taxation issues, but she denied all other aspects of BNSF's post-trial motion. Well, Mr. Groble says that there was a remitter issue hanging out there. Do you agree? We don't agree, Your Honor, because the motion that BNSF submitted, while these two issues were under the same argument point heading, the motion clearly delineated that BNSF was requesting a remitter for disability payments, but a set-off for taxation issues. Frankly, the request for a remitter was invalid in any event because the jury did not hear any evidence relating to disability payments. So the request for a remitter was improper on its face, but BNSF did not ask for a remitter for taxation. It asked for a set-off for taxation. And Judge McWilliams' ruling was clear, her oral ruling, that all post-trial relief is denied. I'm reserving ruling on the request for a taxation set-off. Why does the phrase relating to disability payments plus taxes, why was that phrase inserted? Why the words disability payment? Frankly, Your Honor, I'm not sure why that was considered. It's an ambiguity in the record. But, of course, if the judge denies something and then comes back at some subsequent time and re-rules, that couldn't hold the period of time for filing a notice of appeal. The time for filing a notice of appeal, if Judge McWilliams' oral ruling on April 18 was effective, was 30 days from April 18, 2012. BNSF didn't file its notice of appeal until June 29, 2012. Just so I'm clear, do you think her ruling was effective on April 18? We do, Justice Neville. We did find one case that suggested, out of the Fourth District of this court, that suggested that Illinois Supreme Court Rule 272, which governs the entry of judgments and requires a written order in the law record, also applies to disposal of post-trial motions. So that was stated in dicta in that case. So our submission doesn't take any position on that particular issue, Your Honor. But these are, of course, threshold questions that the court must review to ensure it has subject matter jurisdiction over the case. Turning to the termination evidence issue, it was well within Judge McWilliams' discretion to exclude any mention of the post-injury termination on relevancy grounds. As the Eighth Circuit explained in Martinez v. Union Pacific Railroad Company, when a railroad fires an injured worker, that firing is irrelevant to the worker's feel or claim. BNSF does not challenge Martinez. It does not argue that Martinez was wrongly decided or that Martinez's analysis is somehow inapplicable here. Instead, it simply cites to a different Eighth Circuit decision, Wright v. Arkansas and Missouri Railroad Company, for the proposition that under some circumstances, it is not an abuse of discretion to admit evidence of termination. We do not doubt that, but it is beside the point in this appeal. In this appeal, BNSF must demonstrate that Judge McWilliams' decision to exclude this evidence was so obviously arbitrary, fanciful, or unreasonable that no reasonable judge would agree with it. In light of Martinez and Wright, that's an impossible showing to make. In Wright, both the trial court and the appellate court agreed that this evidence was irrelevant and should not be admitted. In Wright, the trial judge did exactly what Judge McWilliams did. He entered a pretrial ruling barring any mention of the termination at trial. What happened in that case was subsequent to that pretrial ruling, the plaintiff took the stand and lied under oath. He testified that he could not return to work at the railroad because of his injury, when in fact the plaintiff had been working in the railroad for about two months after his injury and was terminated about two months after his injury, one day when he left work early and was found by railroad personnel in a local casino. The trial judge found that this false and misleading testimony opened the door to the termination issue and admitted evidence of termination for the limited purpose of rebutting that prejudicial and unfair inference that was created by the plaintiff. Obviously, that's simply a different factual scenario from what we have here, but even under those circumstances where the appellate court found that that decision, the trial court's finding that the door was opened was a reasonable one, the appellate court still described the decision to admit evidence of termination as a close call. As we explained in our brief, when an evidentiary ruling is a close call, neither decision can constitute an abuse of discretion. Wright actually, it's puzzling that BNSF cites to Wright because BNSF cites it as if it says that this evidence is relevant and admissible when in fact Wright says the exact opposite. Wright affirmed the admissible of this evidence under the curative admissibility doctrine, the opening the door doctrine. You don't open the door to evidence that is so obviously relevant that it must be admitted. You only open the door to irrelevant evidence and it's admitted for the limited purpose of rebutting a prejudicial inference. BNSF says that you open the door by some questions. Yes, Your Honor, that's BNSF's argument. BNSF points to two questions in the trial transcript. It's plucked two questions out of the transcript. There's one from, one question took place in the examination of Tony Marquis, who was QTS's railroad safety expert. That question and answer had absolutely nothing to do with the end of Mr. Williams' employment with BNSF. It had to do, all plaintiff's counsel was doing in that question was referring Mr. Marquis to an exhibit that contained a written policy from BNSF that stated that an employee must follow a supervisor's orders. There was a point of contention at trial because BNSF claimed that it had an orders and escalated. But BNSF's written policy was actually a strict written policy requiring employees to follow all supervisors' orders and that policy did not contain an exception for tasks that the employee thought were unsafe. So that question and answer simply was directed towards that issue, the empowerment policy issue. It didn't have anything to do with the end of Mr. Williams' employment. The second question occurred during the testimony of Rush Shoup, who was a BNSF employee. On direct examination from BNSF's counsel, Mr. Shoup testified that Mr. Williams told him that he swung the 5-iron like a baseball bat against the pin and Mr. Shoup opined that that was an unsafe thing to do and it was an improper use of that tool. In rebutting that, both the claimed admission from Mr. Williams and Mr. Shoup's opinion that this was an unsafe thing to do, plaintiff's counsel asked Mr. Shoup whether he would have disciplined an employee who he saw using it in that allegedly improper manner. I thought he asked was Mr. Williams disciplined as a result of this? I believe the question was if you saw him doing this, would you have disciplined him? And Mr. Shoup's response to that was I would have told him not to do it. Now, BNSF claims that what this did is it created an inference that the jury could have accepted that Mr. Williams was not disciplined or not told he did the wrong thing because Mr. Shoup knew that he didn't need to because Mr. Williams was going to be terminated all along. There's no factual evidence to support that argument, but even if that were a possible inference that the jury could have drawn, it would not supply a basis for a new trial because there's no evidence in the record that the jury in fact drew that inference. On the contrary, the jury assessed Mr. Williams' contributory negligence at 50%. BNSF's principal argument for a finding of contributory negligence was that Mr. Williams swung the five iron against the pin in an improper manner. So it appears that the jury actually credited that testimony of Mr. Shoup. And as we know in that brief, the trial court has broad discretion in determining whether a question and how far that door opens. And BNSF has simply presented no authority for the support that declining to admit this evidence on a curative basis based on that question was an abuse of discretion. In BNSF's reply brief, it advances a new argument for how plaintiffs opened the door. On BNSF's reply brief, page 13, it cites the testimony from Mr. Williams testifying that he could not return to work for BNSF in any capacity. And BNSF tries to liken that to the testimony in the Wright case. Well, the problem with that argument and what BNSF doesn't mention in its reply brief is that it was BNSF's own trial counsel who elicited that testimony from Mr. Williams through a leading question on cross-examination. That testimony is cited in page 13 of BNSF's reply brief. It's found on page 3026 of the trial record, volume 19. Counsel asked Mr. Williams, sir, in your personal opinion, you could not return to work at BNSF because of your injury. Isn't that correct? To which Mr. Williams responded, true. So if that testimony in any way created a false and misleading perception for the jury, and we don't believe it does, but to the extent it did, BNSF has no one to blame for that, but its own trial counsel. I'd like to briefly respond to the arguments raised in the briefs on the household services issue. As we explained in our brief, BNSF waived any challenge to the economic testimony from plaintiff's economic expert, Stan Smith, concerning Mr. Williams's lost household services by failing to contemporaneously object. In Illinois, it's settled that a contemporaneous objection is required to preserve an argument that evidence was improperly admitted. Here, BNSF's complete failure to contemporaneously object renders those issues waived. So while Dr. Smith's testimony was entirely proper for the reasons we explained in our brief, this court need not reach the issue because BNSF has waived those arguments by failing to object. Unless the court has questions, we would stand in our briefs. Thank you very much, Your Honors. And I'd like to conclude by saying that I'm sure all the parties agreed hold heartily and were moved by Justice Hyman's opening. So thank you very much. And if you need more than two minutes, you can go. Well, I have just a few brief issues I want to address. The way QTS phrased this, the contract, it just has this simple notice provision. You just give QTS notice of something that happens. If there's any doubt about it, you give them notice, as you would an insurance carrier. But QTS is not a remote insurance carrier. They are on the grounds 24 hours a day, seven days a week. And notice doesn't just sit out there in a void. Notice triggers responsibilities on their part. They are required to assume the defense of the claim immediately and required to indemnify and hold BNSF harmless. Otherwise, QTS is bound by whatever BNSF does in the defense of the claim. The contract also imposes an affirmative duty on QTS to notify BNSF about injuries. And that is at paragraph 4A, page A11 of the appendix. It says, contractors shall notify a railroad company immediately upon the other event involving personal injury or property damage at the terminal. Didn't they do that by calling the BNSF supervisor to take Mr. Williams to the hospital? They absolutely met that obligation. But that is a pure notice provision. You notice, you give us notice of it, and then whatever happens, happens. In contrast, in the indemnity provision, if BNSF gives QTS notice of a claim for which QTS is responsible under the agreement, QTS has the obligation to assume the defense of that claim. It has to indemnify BNSF and hold BNSF harmless. So one notice, QTS's notice of the incident to BNSF, doesn't impose any obligation on BNSF. But BNSF's notice to QTS does impose an obligation on that. With respect to the termination evidence, I would suggest that it does have a bearing on Mr. Williams' claim for lost wages because the jury was left to believe that he would have continued working at BNSF if not injured. It's not true. What about the argument it was taken account of in the contributory negligence?  No, but it sure appears that way. I understand that sometimes juries blend negligence and damages, but we have to say that that's attributable to it. There were two points at which the discipline issue was raised, and we cite them in our brief, at page 32 of our brief. And in one, Mr. Schaub said, I would have told him not to do it, but the question was, you would have disciplined him, correct, if you saw him doing that. And so there's an implication that if Mr. Williams had been doing it incorrectly, he should have been disciplined, and he wasn't. But we couldn't have disciplined him because he no longer worked for BNSF. And in the Mr. Marquis' colloquy, it was about the directive of following your employer's designated representative in charge, their direction. Otherwise, you would be subject to discipline, correct. So the implication is, again, that because Mr. Williams wasn't disciplined, what he was doing was not wrong. And then the last thing I'd like to address is the timeliness issue. Very briefly, in our response to the motion to dismiss, which was originally filed with this court, we cited a number of cases talking about the unity of the post-trial motion and what's required in there. And I would cite the court to the Uphoff case in which there were two competing post-trial motions. One was timely. The husband's, the wife's was untimely. When the husband's post-trial motion was finally decided, the wife appealed from that. And the Uphoff court found implicit in the decision is the court's retention of complete jurisdiction until after the disposition of the last timely filed post-trial motion. As long as any party's timely post-trial motion remains undisposed, the underlying judgment is not final, notice of appeal is premature, and complete jurisdiction remains in the circuit court. But that presumes a request for a set-off falls within the category of post-trial motions, and Star Charter says it doesn't. Well, Star Charter says it does not have to be filed within 30 days of the judgment. It does not address this. It says it's not a motion directed to the judgment. It's a partial satisfaction. But, Judge, I would respectfully suggest that a motion for remitter is a motion directed to the judgment, does stay the requirement for filing a notice of appeal until it's decided, and that the trial court judge decided that on June 6, 2012, it's in the transcript and it's in the written order. So the prior oral order was a partial disposition of the motion for summary judgment, which would have made filing a notice of appeal premature. I just have a question on the directed verdict. Where was the court's ruling on the directed verdict? I took that as a denial of the U as a global U, Judge. I took that as a denial of both post-trial motions. But as we pointed out in our reply, it's not even necessary to file a motion for directed verdict in order to challenge the rulings in the trial court. And we did, in fact, do that in our post-trial motion. Thank you very much. Thank you, Ron. Thank all the lawyers. Excellent arguments. And we appreciate the time and effort you put into it. We'll take it under consideration. We'll take a two-minute recess and reconvene.